**FLORSHEIM SHOE COMPANY, DIV. OF INTERCO, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 83–1371.**

United States Court of Appeals, Federal Circuit.

July 12, 1984.

William D. Outman, II, Washington, D.C., for appellant; Mumford Page Hall, II, Washington, D.C., of counsel.

Michael P. Maxwell, argued, New York City, Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C., and Joseph I. Liebman, Attorney in Charge Intern. Trade Field Office, New York City, for appellee.

Before DAVIS, BALDWIN and MILLER, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decision of the Court of International Trade (CIT) dismissing, on the defendant's motion, plaintiff Florsheim Shoe Company's (Florsheim's) complaint against the United States (the Government). In that complaint, Florsheim challenged the United States Customs Service's denial of Florsheim's protests against the agency's classification of imported Indian buffalo leather and goat and kid leather, not fancy, as dutiable merchandise. The CIT properly decided that Florsheim was attacking the basis for Cus-

toms' denial of the protests—certain Executive Orders in which the President withdrew duty-free treatment (under the Generalized System of Preferences) from those Indian leather products [1]—and held that Florsheim had stated no claim upon which relief could be granted because, to the extent the President's action may be subject to severely limited judicial review, there was no ground for disputing it here. The CIT's opinion is reported at 570 F.Supp. 734 (CIT 1983). Florsheim also challenges an earlier CIT decision, suspending discovery pending disposition of the Government's motion to dismiss. *Florsheim Shoe Company v. United States*, No. 83–2 (CIT Jan. 7, 1983). We hold that the CIT did not abuse its discretion in ordering suspension of discovery, and we also affirm its dismissal of Florsheim's complaint.

I

### Background

Florsheim is an American shoe manufacturer. It imports buffalo leather and goat and kid leather, not fancy, from India for use in its manufacturers.

India has been designated by the President as a "beneficiary developing country" pursuant to the Generalized System of Preferences (GSP). The GSP is a trade program, established by Title V of the Trade Act of 1974,[2] which authorizes the President to provide duty-free treatment for eligible articles imported from qualifying developing nations for the purpose of promoting their economic development. In January 1977, the President placed buffalo leather on the list of articles eligible for duty-free treatment under the GSP. Executive Order No. 11960, 42 Fed.Reg. 4317. In February 1977, however, the President excluded buffalo leather imports from India from this preferential treatment. Exec-

utive Order No. 11974, 42 Fed.Reg. 11230A. Similarly, in March 1980, goat and kid leather, not fancy, were added to the list of GSP eligible articles, but Indian imports of these articles were denied duty-free entry. Executive Order No. 12204, 45 Fed.Reg. 20740. Executive Order No. 12204 also continued the denial of duty-free treatment for imports of buffalo leather from India. Executive Order No. 12302 (46 Fed.Reg. 19901), issued in April 1981, then continued the denial of duty-free treatment for imports of buffalo leather and goat and kid leather, not fancy, from India.

In 1979, Florsheim filed a petition with the United States Trade Representative (USTR) requesting the subdivision of item 121.55 of the Tariff Schedules of the United States (TSUS) to create a separate category for water buffalo leather. Florsheim also asked for duty-free treatment of Indian water buffalo leather pursuant to the GSP because "no like or directly competitive article" was produced in the United States as of January 3, 1975, the effective date of the Trade Act of 1974. *See* 15 C.F.R. § 2007. In July 1980, the USTR denied Florsheim's petition on the basis of its determination that an article directly competitive with water buffalo leather was produced in the United States as of January 3, 1975.

In 1980, Florsheim filed another petition with the USTR requesting duty-free treatment for water buffalo leather and goat and kid leather, not fancy, alleging that no like or directly competitive article was produced in the United States in January 1975. The USTR denied this second petition on June 11, 1981 on its finding that there was domestic production of goat and kid leather as well as production of calf leather, a product directly competitive with water buffalo leather.

---

**1.** We too assume that Customs' denial of the protests was prompted by these Executive Orders. The record before us does not include copies of the notices of denial of Florsheim's protests which are required by statute to include a statement of the reasons for the denial. 19 U.S.C. § 1515(a). However, both parties and

the Court of International Trade represent (implicitly, if not explicitly) that Customs' action was a direct consequence of the Executive Orders, and we rely on that representation.

**2.** 88 Stat. 2066–2071, Pub.L. 93–618, 19 U.S.C. § 2461 *et seq.*

Between September and December 1981, Florsheim filed several protests with the Customs Service disputing the classification of these Indian leather products as dutiable merchandise. The Customs Service denied those protests between October 1981 and February 1982. In April 1982, Florsheim filed its complaint with the CIT, seeking review of Customs' denial of the protests. In that suit, in October 1982, Florsheim served the Government with interrogatories and a request for production. Before responding to those discovery requests, the Government, in November 1982, moved to dismiss the action for failure to state a claim upon which relief could be granted. A short time later, the Government filed an additional motion, asking that the court suspend discovery pending decision on the motion to dismiss. The CIT granted such suspension in January 1983.

The CIT granted the Government's motion to dismiss and entered judgment dismissing the action in July 1983. From an analysis of Florsheim's complaint, the court identified the root of Florsheim's grievance as the President's Executive Orders denying the leather products duty-free treatment under the GSP. It addressed each of the three alleged grounds for the Government's motion:

(1) Florsheim lacks standing to seek review of the Presidential action challenged by the complaint;

(2) The President acted within his delegated authority under Section 504 (19 U.S.C. § 2464) in denying duty-free treatment to the leather merchandise; and

(3) The President's action was not subject to judicial review, except to insure conformity with the President's delegated authority and compliance with the procedural prerequisites to taking action.

On the issue of standing, the court held that Florsheim had statutory standing under 28 U.S.C. § 2631(a) to contest the denial of its protests against the customs duty

assessments on the goods it imported. The court also decided, however, that the President's action in limiting the application of duty-free treatment was within his delegated authority under Section 504 and that the court could not review the factual foundation for the President's action.

## II

### Standing

■ We agree with the CIT that Florsheim has standing under 28 U.S.C. § 2631(a) to challenge the Customs Service's denial of its protests. That section confers standing on a person who files a protest pursuant to Section 514 of the Tariff Act of 1930 to bring a civil action (in the Court of International Trade) contesting the denial of the protest.[3] It provides:

§ 2631. Persons entitled to commence a civil action

(a) A civil action contesting the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930 may be commenced in the Court of International Trade by the person who filed the protest pursuant to section 514 of such Act, or by a surety on the transaction which is the subject of the protest.

It is undisputed that Florsheim filed several protests with the Customs Service attacking the classification of Indian water buffalo leather and goat and kid leather, not fancy, as dutiable merchandise, and it is also undisputed that these protests were denied. There is nothing in the record before us to indicate, and the Government does not allege, that Florsheim failed to have standing to file a protest pursuant to Section 514 of the Tariff Act of 1930. That provision states, in relevant part:

(a) Except as provided in [exceptions omitted as irrelevant] ... decisions of the appropriate customs officer, *including the legality of all orders and findings entering into the same,* as to—

\* \* \* \* \* \*

---

**3.** *See* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 22 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad. News 3729, 3733 ("Proposed section 2631 estab-

lishes standing requirements for those who commence a civil action in the Court of International Trade.")

(2) the classification and rate and amount of duties chargeable;

\* \* \* \* \* \*

shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section, or unless a civil action contesting the denial of a protest, in whole or in part, is commenced in the United States Court of International Trade . . . .

\* \* \* \* \* \*

(c)(1) . . . Except as provided in [exceptions omitted as irrelevant] . . . protests may be filed with respect to merchandise which is the subject of a decision specified in subsection (a) of this section by—

(A) *the importers or consignees shown on the entry papers* . . . ;

(B) *any person paying any charge or exaction;* . . .

19 U.S.C. § 1514 (emphasis added). Florsheim is the domestic importer of the leather goods, and it also paid the duty on the entries that are the subject of its protests. Either one of these connections to the merchandise qualifies Florsheim, under the terms of the statute, to file a protest. As a party which properly filed protests with the Customs Service pursuant to Section 514 and whose protests were denied, Florsheim would seem to have standing pursuant to 28 U.S.C. § 2631(a) to challenge that denial in the CIT.

■ The Government contends, however, that "the existence of 28 U.S.C. § 2631 [and, presumably, Florsheim's meeting of its requirements] does not obviate the fact that Section 504's zone of interests does not encompass importers such as Florsheim." We understand the Government's argument to be that Section 2631(a) is not

an implied grant of subject matter jurisdiction permitting, without more, judicial review of Customs' denial of *all* protests, no matter the administrative basis for them. We find it difficult to accept the Government's overriding premise as to the need for a proper protester also to be within some external "zone of interests," but even if we assume *arguendo* the correctness of that general position, Florsheim would still have standing to maintain this action because its interests are within the "zone of interests" of Section 504 (19 U.S.C. § 2464).

"Zone of interests" is a shorthand description of a test for standing, requiring that a complainant show that the interest it seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). *See also Valley Forge, supra,* 454 U.S. at 475, 102 S.Ct. at 760; *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976).[4]

Section 504 of Title V of the Trade Act of 1974 (the Act), 19 U.S.C. § 2464, is entitled "Limitations of Preferential Treatment," and it describes the circumstances in which the President may or must limit duty-free treatment of eligible articles from beneficiary countries and the factors which go into that decision. It is incontestable that Congress was aware, when it enacted this legislation and the rest of Title V of the Act, that it was creating another layer of import duty regulations, and was thus regulating importers, who must pay the duties imposed. Those importers are directly in-

---

**4.** The "zone of interests" test is a non-constitutional prudential limitation on a court's exercise of jurisdiction in contrast to the mandatory Article III requirement that a would-be litigant demonstrate that it has suffered an actual injury which can be fairly traced to the challenged action and which is likely to be redressed by a favorable decision. *Valley Forge Christian Col-*

*lege v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). As an importer of the Indian leather at issue, Florsheim's financial interest in the action it challenges and the likelihood that a favorable decision would redress its injury (the paying of duties) are undisputed.

terested in the working of the Act. This is more than sufficient, in itself, to bring Florsheim within the zone of interests of the Trade Act.

We note, moreover, that the regulatory scheme enacted pursuant to Title V of the Act (which includes, of course, Section 504) and to the related Executive Order 11846 (40 Fed.Reg. 14291, March 27, 1975)[5] established a system which invites and considers the opinions of importers on GSP policy. That system consists of a Trade Policy Staff Committee (TPSC) which prepares recommendations (reviewed by the USTR) for the President regarding whether (1) additional articles should be designated as eligible for the GSP; (2) duty-free treatment accorded to eligible articles should be withdrawn, suspended, or limited; or (3) product coverage should be otherwise modified. 15 C.F.R. § 2007.2. These recommendations are prompted by a request from an "interested party or foreign government" (or by the TPSC on its own motion) that present GSP policy be altered. The regulations define "an interested party" as covering:

> a party who has a significant economic interest in the subject matter of the request, or any other party representing a significant economic interest that would be materially affected by the action requested, such as a domestic producer of a like or directly competitive article, a *commercial importer* or retailer *of an article which is eligible for the GSP or for which such eligibility is requested.*

*Id.* § 2007.0(c) (emphasis added). The regulations go on to direct the petitioner to include in his request for designation of an additional article as eligible for the GSP information regarding, *inter alia*, *"How the GSP treatment would affect the petitioner's business* and the industry producing like or directly competitive articles in the United States ...." *Id.* § 2007.-1(a)(4)(i) (emphasis added). Similarly, petitioners asking for withdrawal, suspension, or limitation of duty-free treatment are asked to include information on *"the effect imports receiving duty-free treatment under the GSP have on* competition and *the business of the interest on whose behalf the request is made ...." Id.* § 2007.1(a)(5)(viii) (emphasis added). In other words, the regulations invite petitions from importers regarding GSP treatment and ask that they supply information on the impact of the requested or present policy on their specific business interests. Thus, the Government itself has acknowledged, in the regulations it promulgated pursuant to the statutory GSP scheme, that the interests of commercial importers, as well as others, are relevant to determining GSP policy and that it considers those interests in making recommendations to the President.

Finally, there is adequate evidence on the very face of the statute, especially Section 504(d) (19 U.S.C. § 2464(d)), that Congress intended to protect the interests of importers of goods entitled to preference. That section provides, *inter alia*, that compulsory withdrawal of duty-free treatment under the terms of Section 504(c) (19 U.S.C. § 2464(c)) is not required for articles for which no competitive product was produced in the United States in January 1975. *See* notes 11 and 12 *infra*, and accompanying text. The Government argues that this provision merely extinguishes the rights of entities seeking to compel the President to withdraw duty-free treatment pursuant to Section 504(c)(1)(B). In the Government's opinion, Section 504(d) is merely a defense which may be asserted by the President against those who demand that duty-free treatment must be denied according to the terms of Section 504(c)(1)(B)—but that no domestic importer has any litigable interest at all. The Government cites no authority for its interpretation of § 504(d), and we find no support for it in the legislative history or the implementation of that provision. In our view, the Government's reading is too narrow, and we agree with Florsheim that it is more reasonable to inter-

---

**5.** Executive Order 11846 conferred upon the Special Representative for Trade Negotiations the responsibility (in consultation with the Secretary of State) for administration of the GSP.

pret § 504(d) as encompassing the interests of domestic importers. As pointed out by Florsheim, the entities that are benefited by § 504(d) and aggrieved by the President's failure to follow it are the beneficiary developing nation which exports the merchandise in question and the domestic importer.

For these various reasons, we hold that Florsheim can sue under 28 U.S.C. § 2631(a), and that its interests are "arguably within the zone of interests sought to be protected or regulated" by Section 504.[6]

### III

*Presidential Authority Under Section 504*

Section 504, 19 U.S.C. § 2464, gives the President certain authority to end or withdraw duty-free treatment accorded under the GSP. In this case, the CIT read Florsheim's complaint, without dispute, as a charge that "the President improperly denied duty-free treatment to the subject merchandise under the competitive need formula of Section 504(c)(1)(B) because the USTR erred in his determination under Section 504(d) that articles like or directly competitive with the imported merchandise

were produced in the United States on January 3, 1975." 570 F.Supp. at 738.[7]

■ We find it unnecessary, however, to reach the questions of the President's authority under Section 504(c)(1)(B) or of the alleged determinations under Section 504(d). Section 504(a) (19 U.S.C. § 2464(a)), another provision of Section 504 considered by the CIT below and invoked by the pertinent Executive Orders (*see* subpart D, *infra*), is sufficient authority, in itself, for the President's limitation here of preferential duty treatment. We therefore confine our consideration to that provision.

Section 504(a) declares (as it appears in Title 19, U.S.C.):

The President may withdraw, suspend, or limit the application of the duty-free treatment accorded under section 2461 of this title with respect to any article or with respect to any country; except that no rate of duty may be established in respect of any article pursuant to this section other than the rate which would apply but for this subchapter. In taking any action under this subsection, the President shall consider the factors set forth in sections 2461 and 2462(c) of this title.[8]

---

**6.** The Government discusses the cases of *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971), and *Peoples Gas, Light & Coke Co. v. United States Postal Service,* 658 F.2d 1182 (7th Cir.1981), at some length. These cases are inapposite because they hold only that the plaintiffs were not within the zone of interests protected by the statutes under which they were suing, the Lanham Act (*Colligan*) and the Postal Reorganization Act (and other Postal Service legislation) (*Peoples Gas*). As the Government itself points out, the parameters of a statute's "zone of interests" vary from statute to statute and must be decided within the context of the particular statute.

**7.** Section 504(c)(1)(B) *requires* the President, if he determines that a certain specified standard has been met, to withdraw duty-free status, unless he nevertheless finds certain other listed facts or qualifications to exist. *See* note 10, *infra.* Subsection (d) of Section 504 declares (in part): "Subsection (c)(1)(B) of this section does not apply with respect to any eligible article if a like or directly competitive article is not produced on January 3, 1975, in the United States." *See* note 11, *infra.*

**8.** Section 2461 [of Title 19, Section 501 of the Trade Act] lists the factors which go into the President's decision to provide duty-free treatment for eligible articles from a beneficiary developing country in the first instance. They are:

(1) the effect such action will have on furthering the economic development of developing countries;

(2) the extent to which other major developed countries are undertaking a comparable effort to assist developing countries by granting generalized references [sic] with respect to imports of products of such countries; and

(3) the anticipated impact of such action on United States producers of like or directly competitive products.

Section 2462(c) [of Title 19, Section 502(c) of the Trade Act] lists the factors which the President takes into account in determining whether to designate a country as a beneficiary developing country:

(1) an expression by such country of its desire to be so designated;

(2) the level of economic development of such country, including its per capita gross national product, the living standards of its

### A

We join the CIT in interpreting this subsection (a) as an explicit grant to the President of plenary authority—just as the statutory text indicates—to "withdraw, suspend, or limit" GSP duty-free treatment after consideration of the factors listed in Sections 501 and 502(c), *supra.* This broad, discretionary reading is fully supported by the legislative history. The House Report says with respect to the provision which became Section 504(a):

> The President would be authorized to withdraw, suspend, or limit preferences *at any time* with respect to any article or any beneficiary developing country. In taking such action, the President would be required to consider the factors taken into account in granting preferential treatment initially and in designating beneficiary countries. (Emphasis added.)

H.R.Rep. No. 571, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7355–56. In contrast, the next paragraph of the legislative history, describing the future Section 504(c), sharply limits the Executive's discretion:

> The President would be *required* to withdraw or suspend preferential treatment from any country which ceases to be eligible under the requirements of section 502(b) .... The competitive need formula is in general designed to provide an *express requirement governing the*

*withdrawal or suspension of preferential treatment* in those cases where it can no longer be justified ....

*Id.* at 7356–57 (emphasis added).[9] Use of the term "may" (in Section 504(a)) in the phrase "The President may withdraw, suspend, or limit preferences ..." likewise strongly indicates that Congress granted the President broad discretion to take the described actions. *See Southern Railroad Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 455, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979).

We must also bear in mind that the subject matter of Section 504 is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not "hemmed in or 'cabined, cribbed, confined' by anxious judicial blinders." *South Puerto Rico Sugar Co. Trading Corp. v. United States,* 334 F.2d 622, 632 (Ct.Cl.1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965).

Section 504(c)(1)(B) and 504(d) neither add to nor diminish the President's discretion under 504(a). Section 504(c)(1)(B), as mentioned above, is a *mandatory* provision, requiring that the President deny duty-free treatment when he determines that the imports meet the "competitive need formula"—unless he makes certain alternative findings.[10] Section 504(d) says

---

inhabitants, and any other economic factors which he deems appropriate;

(3) whether or not the other major developed countries are extending generalized preferential tariff treatment to such country; and

(4) the extent to which such country has assured the United States it will provide equitable and reasonable access to the markets and basic commodity resources of such country.

**9.** The House Conference Report also indicates that § 504(c) is a mandatory provision. It says plainly, "The House bill *terminates* preferential treatment for a particular article from a particular country ... [when the competitive need formula is met (*see* note 10) ]." H.R. No. 1644, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 7367, 7398. The House bill originally provided that this limitation could be waived by the President for reasons of national interest, but the Senate proposed an amendment (which was adopted) "restrict[ing] the Presi-

dent's authority to waive ... [the limitation] ... [to certain specified circumstances (*see* note 10) ]." *Id.*

**10.** Section 504(c)(1) provides:
Whenever the President determines that any country—

(A) has exported (directly or indirectly) to the United States during a calendar year a quantity of an eligible article having an appraised value in excess of an amount which bears the same ratio to $25,000,000 as the gross national product of the United States for the preceding calendar year, as determined by the Department of Commerce, bears to the gross national product of the United States for calendar year 1974, or

(B) except as provided in subsection (d) of this section, has exported (either directly or indirectly) to the United States a quantity of any eligible article equal to or exceeding 50 percent of the appraised value of the total

only that § 504(c)(1)(B) is inapplicable with respect to an eligible article if a competitive article was not produced in the United States on January 3, 1975 or if the dollar value of imports of that article falls below a certain level.[11] The provisions of this subsection (d) would be relevant only if we were to consider the President's authority under Section 504(c), which we do not do.[12] In short, subsection (a) is unaffected by subsections (c) and (d).

Florsheim then argues that, even so, Section 504(a) does not authorize the withdrawal of duty-free treatment from a *specific* article from a *particular* country. It maintains that, under that section, the President may delete a country from the list of beneficiary developing nations, *or* he may withdraw an article from the list of eligible articles. In other words, the President may only limit duty-free treatment for a particular article from all countries or for all articles from a particular country.

Florsheim's over-emphasis on the word "or" in Section 504(a) ("with respect to any article *or* with respect to any country" (emphasis added)) as restricting the President's power, leads to an interpretation of the President's authority that is at odds with the clause's overall provision that "the President may withdraw, suspend, or *limit* the application of the duty-free treatment ... with respect to any article or with respect to any country ...." (Emphasis added.) The only (or at least the best) way by which the President can "limit" the application of duty-free treatment respecting a particular country is to exclude certain articles from that country from duty-free treatment. The same is true for limiting the application of duty-free treatment with respect to an article; that can be done by limiting the countries to which duty-free treatment is given for that article.

Florsheim's response that the word "limit"

simply means that the President can restrict the quantity of a particular article which will be permitted duty-free treatment under the GSP when imported from all countries, or restrict the quantity of all duty-free articles imported from a particular beneficiary developing country

is unacceptable. That restricted view of "limit," as simply giving the President the authority to impose quantitative limits on GSP treatment, would make the term "limit" superfluous. Section 504(a) already gives the President authority to "suspend" GSP treatment. If the President "limits"

imports of such article into the United States during any calendar year,

then, not later than 90 days after the close of such calendar year, such country shall not be treated as a beneficiary developing country with respect to such article, except that, if before such 90th day, the President determines and publishes in the Federal Register that, with respect to such country—

(i) there has been an historical preferential trade relationship between the United States and such country,

(ii) there is a treaty or trade agreement in force covering economic relations between such country and the United States, and

(iii) such country does not discriminate against, or impose unjustifiable or unreasonable barriers to, United States commerce, then he may designate, or continue the designation of, such country as a beneficiary developing country with respect to such article.

11. Section 504(d) provides:

Subsection (c)(1)(B) of this section does not apply with respect to any eligible article if a like or directly competitive article is not produced on January 3, 1975, in the United States. The President may disregard subsection (c)(1)(B) of this section with respect to any eligible article if the appraised value of the total imports of such article into the United States during the preceding calendar year is not in excess of an amount which bears the same ratio to $1,000,000 as the gross national product of the United States for that calendar year, as determined by the Department of Commerce, bears to the gross national product of the United States for calendar year 1979.

12. The legislative history of this subsection (d) (as well as its text) supports our view that it comes into play only when Section 504(c)(1)(B) is involved. That history discusses the future Section 504(d) solely in the context of the Section 504(c)(1)(B) competitive need formula, saying, merely, "The 50 percent ceiling would not apply in the case of articles where no like or directly competitive product is produced in the United States." H.R.Rep. No. 571, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7356.

preferential treatment by setting a quota for the number of articles which will be permitted to enter the United States duty-free, he is effectively suspending duty-free treatment at a pre-determined point in time. On Florsheim's reading, "limit" would play no separate role at all.

Above all, we must remember that this is a statute giving broad discretionary authority to the President in a field trenching very closely upon foreign affairs and on our relations with other countries. Though an "or" in a statute may often call for a disjunctive interpretation, "this canon is not inexorable, for sometimes a strict grammatical construction will frustrate legislative intent." *United States v. Moore*, 613 F.2d 1029, 1040 (D.C.Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980). Here, the completely disjunctive meaning of "or" ("any article" *or* "any country") which Florsheim stresses would clearly result in an unreasonable, overly narrow, and self-contradictory interpretation not suitable for a statute of this character. Words are not, after all, "pebbles in alien juxtaposition; they have only a communal existence ...." *National Labor Relations Board v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941) (per L. Hand, J.).

### B

Nor can we accept appellant's point that, if Section 504(a) is interpreted as empowering the President to take the action challenged here, the statute embodies an unconstitutional delegation of Congress' commerce power. In that connection we repeat that the subject matter of Section 504 involves foreign affairs, an area in which broad grants by Congress of discretion to the Executive are common. *See South Puerto Rico Sugar, supra*, 334 F.2d at 631–32 ("In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy."). In this instance Congress has in fact circumscribed the President's discretionary authority under Section 504(a) with general guidelines for its exercise. Prior to taking action under that section, the President must consider the factors set forth in Sections 501 and 502(c). *See* note 8, *supra*. In addition, the President's authority under Section 504(a) is limited—although he may withdraw preferential treatment entirely, he may not adjust rates of duty. He is also required to report to Congress pursuant to Section 505. These restrictions are certainly adequate to insure that the statute is not an improper delegation of legislative authority. *See United States v. Yoshida International, Inc.*, 526 F.2d 560, 582–83 (CCPA 1975).

### C

Once it is determined, as we have just done, that the President's exercise of his authority under Section 504(a) to limit duty-free treatment for these Indian leather goods was within his constitutionally delegated power, there is no further role for the CIT or for this court. Both Supreme Court and Court of Customs and Patent Appeals precedent have established that the Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements. The President's findings of fact and the motivations for his action are not subject to review. *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80, 60 S.Ct. 944, 946, 84 L.Ed.2d 1259 (1940); *United States Cane Sugar Refiners' Association v. Block*, 683 F.2d 399, 404 (CCPA 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202, 206 (CCPA 1972).

Although Section 504(a) prescribes certain factors that the President must consider in making his decision (*see* note 8, *supra*), these factors do not amount to a formula for the decision-making process which can be judicially reviewed. Although the President must consider these factors, he has discretion to ascertain their significance and is also at liberty to con-

sider other, possibly countervailing, factors. As the Supreme Court noted in *United States v. George Bush, supra:*

It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, *the judgment of the officer as to the existence of the facts calling for that action is not subject to review* [citations omitted] (emphasis added).

310 U.S. at 380, 60 S.Ct. at 946. In short, the presidential decision is a "multifaceted judgmental decision," for which there is "no law to apply." *See Montgomery Ward & Co. v. Zenith Radio Corp.,* 673 F.2d 1254, 1262 (CCPA), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). After it is decided that the President has congressional authority for his action, "his motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *United States Cane Sugar Refiners' Association v. Block, supra,* 683 F.2d at 404.

### D.

Florsheim counters that, in any event, the foregoing principles are all inapplicable here because the President did not in fact act under the discretionary authority of Section 504(a) but only under Section 504(c)(1)(B), *supra,* a mandatory provision Congress also inserted in Section 504. We reject that position because the pertinent Executive Orders show on their face that they do invoke Section 504(a).

Executive Order No. 12302, issued on April 1, 1981 (prior to the entry date of 121 of the 122 entries that are the subject of this action) cites Section 504(a) as well as Section 504(c) as authority for the President's action. It reads, in pertinent part:

By virtue of the authority vested in me by the Constitution and statutes of the United States of America, including Title V of the Trade Act of 1974 ... and as President of the United States of Ameri-

ca, in order to modify, as provided by *Sections 504(a) and (c) of the Trade Act of 1974* ... the limitations on preferential treatment for eligible articles from countries designated as beneficiary developing countries ... (emphasis added).

Likewise, Executive Order No. 12204, issued in March 1980, (which covers the first of the 122 entries) cites the President's authority under Title V of the Trade Act of 1974 (which, of course, includes Section 504(a)) in addition to its specific reference to Section 504(c). It reads:

By virtue of the authority vested in me by the Constitution and statutes of the United States of America, *including Title V of the Trade Act of 1974* ..., and as President of the United States of America, in order to modify, as provided by Section 504(c) of the Trade Act of 1974 ... the limitations on preferential treatment for eligible articles from countries designated as beneficiary developing countries ... (emphasis added).

Appellant contends that, nevertheless, Section 504(a) was not the "real" basis for the President's action; according to Florsheim, the President actually acted under Section 504(c)(1)(B). As one basis for this argument, Florsheim points out that Section 504(a) was not specifically cited as authority in the President's various Executive Orders concerning water buffalo leather and goat and kid leather, not fancy, until Executive Order 12302 was issued in April 1981. The prior Executive Orders which excluded these leather products from duty-free treatment (*see supra* Part I) cited Title V of the Trade Act of 1974 and also Section 504(c) as authority for the action.

It is sufficient, in order to show that Section 504(a) was invoked, that the pertinent Executive Orders cited that particular provision or (in the case of one entry) the portion of the Act that encompassed that provision. In *Cane Sugar, supra,* those appellants argued that the text of a presidential proclamation did not reflect the President's "real purpose" in issuing the proclamation and the actual source of authority for his action. The response made by the Court of Customs and Patent Appeals is appropriate here:

[Appellant's] concentration on what it insists was the President's real purpose is simply irrelevant .... In sum, let the President's action be authorized, and let his action be within the authorizing provisions of the law he cites, and the role of the judiciary is at an end.

*Id.; see also United States v. Morgan,* 313 U.S. 409, 420, 422, 61 S.Ct. 999, 1003, 1004, 85 L.Ed. 1429 (1941) ("It is not for us to try to penetrate the precise course of the Secretary's reasoning.") In this case, as in *Cane Sugar,* the courts may not go behind the Executive Orders to search for the "actual" basis for the President's action. The CIT was thus correct in refusing to ascertain whether the President's limitation of preferential treatment was "really" taken under Section 504(a) or whether the President believed he was acting pursuant to Section 504(c) alone.[13]

### IV

#### *Suspension of Discovery*

We now turn briefly to Florsheim's subsidiary contention that the CIT wrongfully granted the Government's motion to suspend discovery pending disposition of the motion to dismiss. Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court. *Marroquin-Manriquez v. INS,* 699 F.2d 129, 134 (3d Cir.1983). We find no abuse of that discretion here. The issues raised by the Government's motion to dismiss—Florsheim's standing, the President's authority under Section 504, and the court's scope of review over the President's exercise of that authority—are all questions of law for which factual discovery is not necessary or appropriate. Florsheim says that it wanted to prove conclusively through discovery that the "basis for the President's denial of duty-free treatment under the GSP was, as a matter of fact, Section 504(c)(1)(B), not Section 504(a)." But, as we have said *supra,* the CIT has no authority to look behind the Executive Or-

ders. It was bound to take them at face value. As we have pointed out, the Executive Orders which cover the merchandise at issue, 12204 and 12302, both cite Section 504(a) as at least an alternative ground for the action taken. Executive Order 12302, which covers 121 of the 122 entries in question, cites Section 504(a) specifically, and Executive Order 12204, covering the first of the 122 entries, cites Title V of the Trade Act of 1974, which includes Section 504(a). That is quite enough.

On these grounds, both the CIT's order suspending discovery and its dismissal of Florsheim's complaint are affirmed.

AFFIRMED.

---

13. We do not address Florsheim's claim that the CIT should have determined whether the proper factual predicate existed for presidential action under Section 504(c)(1)(B) (*i.e.,* whether the findings of the USTR relevant to Section 504(d)

were correct or based upon a proper reading of the statute) because of our holding that Section 504(a), by itself, provides adequate authority for the President's action.