1 F.3d 1251
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 In re UNITED STATES, Petitioner.
 Misc. No. 370.
 United States Court of Appeals, Federal Circuit.
 April 19, 1993.
 
 Before ARCHER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and MICHEL, Circuit Judge.
 ON PETITION FOR WRIT OF MANDAMUS
 MICHEL, Circuit Judge.
 
 ORDER
 
 1
 The United States petitions for a writ of mandamus commanding the United States Court of Federal Claims to vacate its March 5, 1993 order that the Acting Secretary of the Air Force must grant access to two additional individuals representing McDonnell Douglas Corporation and General Dynamics Corporation to two classified and compartmented Air Force programs. The United States argues that the court exceeded its lawful authority in ordering increased access to these programs because as a matter of law such access decisions are committed exclusively to the Chief Executive or his delegatee, here the Secretary of the Air Force. McDonnell Douglas and General Dynamics oppose.[1] We grant the writ.
 
 BACKGROUND
 
 2
 This mandamus petition arises from a lawsuit by McDonnell Douglas and General Dynamics against the United States because of the Department of the Navy's termination for default of their contract to produce a stealth attack aircraft called A-12 for basing on aircraft carriers. McDonnell Douglas and General Dynamics claim, inter alia, that the United States breached an implied duty to share with plaintiffs "superior knowledge" about problems in producing stealth aircraft, and their solution, that were discovered in earlier production of the B-2 and A-117A stealth aircraft by other manufacturers. After the court denied the government's motion to dismiss, McDonnell Douglas and General Dynamics sought broad discovery from the Department of the Air Force concerning the B-2 and A-117A programs. Portions of these programs were classified as "Special Access Programs," a more restrictive classification of national security information than a secret or top secret classification. McDonnell Douglas and General Dynamics requested that 17 persons be granted access to review information in the two programs. The court passed this request on to the Secretary via government counsel. The court also allowed the government to respond. In its response, the United States included a declaration from Donald B. Rice, then Secretary of the Air Force. The Secretary determined that not more than 10 individuals shall be granted access. In the November 20, 1992 declaration, the Secretary explained his decision:
 
 
 3
 4. ... I have designated portions of the B-2 and F-117A programs as "Special Access Programs" under [Executive Order] 12356. The "Special Access" designation is reserved for particularly sensitive classified programs in order to further control the access, distribution, and protection of information pertaining to it. Special Access Programs impose "need to know" and access controls beyond those normally required by Department of Defense regulations for access to Confidential, Secret, or Top Secret information. Access to information within a Special Access Program will be granted only to those persons who are essential to the successful completion of the program, or who are required for proper coordination and oversight, and who meet all stipulated personnel security requirements....
 
 
 4
 5. To comply with the Executive Order 12356 requirement to limit access to the greatest extent possible, I have determined the following: a) not more than 10 individuals (including counsel, consultants, or engineers) representing the plaintiffs, are hereby authorized access to the Secret/Special Access level of the B-2 and F-117A programs; b) not more than 4 of those 10 individuals are hereby authorized access to the Top Secret/Special Access level of the B-2 and F-117A programs. Each individual must meet all clearance eligibility criteria in the programs' security guides.
 
 
 5
 (Emphasis added.)
 
 
 6
 The Secretary of the Air Force detailed the dangers associated with unauthorized disclosures of the technological information, stating, inter alia, that it would "weaken our country's ability to defend itself," and that such disclosures also "could place at risk our aircraft and the lives of the crews of those aircraft." The Secretary concluded:
 
 
 7
 9. It is my judgment, after personal consideration of the matter, that the national security information at issue in this litigation, and described herein, must be limited and strictly controlled in the interests of the national security of the United States. The limited access authorized in paragraph 5 above is consistent with the strict limitations that are applied to government employees for access to this national security information.
 
 
 8
 (Emphasis added.)
 
 
 9
 In an order dated December 2, 1992, the Court of Federal Claims directed McDonnell Douglas and General Dynamics to submit the names of 10 persons to the Air Force for access to the programs as granted by the Secretary. They were identified and given actual access. They included technical specialists and attorneys.
 
 
 10
 On February 12, 1993, McDonnell Douglas and General Dynamics moved that two additional persons be granted access by the Secretary to the programs. McDonnell Douglas and General Dynamics noted that the two additional persons included a consultant to better coordinate the technical specialists and a security officer that from the start the Air Force rules had required. The United States responded by citing the Secretary of the Air Force's decision set forth in his declaration that limited access to "not more than 10 individuals (including counsel, consultants, or engineers)." (Emphasis added.) In an order dated March 1, 1993, the Court of Federal Claims directed attorneys for the United States to "request" that the Acting Secretary of the Air Force reconsider the Air Force's denial of access for the additional persons. At the same time, however, the Court of Federal Claims rejected the United States' argument that the Secretary of the Air Force's decision on access was judicially unreviewable, but without citing any authority or explaining its reasons beyond its "responsibility for supervising discovery." The Court of Federal Claims ordered that "[i]f the Air Force determines not to accommodate this limited request [to reconsider], defendant will present at the March 4 hearing the Air Force official who can explain fully the rationale for that decision." (Emphasis added.) At the March 4 hearing, the United States stated that the Acting Secretary of the Air Force had declined to modify the previous determination of Secretary Rice and that an officer, if produced, could not testify with "any more depth than the Secretary's [declaration]" about the basis for the denial of access to more than 10 individuals.
 
 
 11
 On March 5, 1993, the Court of Federal Claims made the following findings:
 
 
 12
 1. Plaintiffs have demonstrated the need for two additional persons with access to the Air Force programs, one of whom has been required by the Air Force itself; and
 
 
 13
 2. Defendant has provided the court no reasons other than "national security" for not admitting two additional people to the Air Force programs; and
 
 
 14
 3. No reasons appear to the court why 10 trustworthy persons with security clearances present no threat to national security while 12 trustworthy persons with security clearances might.
 
 
 15
 (Emphasis added.)
 
 
 16
 The Court of Federal Claims then embarked on a new course. In contrast to its earlier orders "requesting" that greater access be granted by the Acting Secretary, the court now reviewed and reversed Secretary Rice's access decision that had been confirmed by the Acting Secretary. The court ordered that the Air Force immediately "arrange for two persons representing the plaintiffs to be admitted to the Air Force programs in issue." As before, the court cited no source of legal authority for a judge to review or countermand a decision under the Executive Order by a service secretary limiting access to classified, compartmented documents and data. The Court of Federal Claims denied the United States' motion for a stay on March 9, 1993. The United States petitioned this court for a writ of mandamus and on March 12, 1993, we stayed the Court of Federal Claims' order pending our disposition of this mandamus petition.
 
 THE ISSUE
 
 17
 The dispositive legal issue governing this petition for writ of mandamus is very narrow. The issue is not whether the trial court can control the scope of discovery: That is not contested here. Nor is it whether the government may lawfully withhold classified national security information and documents: That, too, is uncontested, as the government has provided access to all documents in the two programs, at least to 10 individuals. Instead, the issue is simply whether the Court of Federal Claims has authority to review and reverse a determination by the Secretary of the Air Force, under Executive Order 12356, regarding the number of persons to whom he shall grant access for Special Access Programs.
 
 DISCUSSION
 I. The Government's Argument
 
 18
 At the outset, we emphasize that the United States is not asserting the "state secrets privilege to protect national security." See United States v. Reynolds, 345 U.S. 1 (1953). Additionally, the United States does not argue that it has determined that the particular persons sought to be added to the group reviewing the programs are untrustworthy or otherwise not eligible for security clearances.[2]
 
 
 19
 What the United States does argue is that the Court of Federal Claims both breached the constitutionally required separation of powers and exceeded its lawful authority by countermanding an access decision of a service secretary, as the President's delegatee, under the Executive Order. In support of this petition, the United States makes the following arguments:
 
 
 20
 --"control of access to classified information is exclusively committed to the sole exercise of judgment by the Executive Branch"
 
 
 21
 --that this exercise of judgment "encompasses the Executive's compelling interest in limiting access to that classified information"
 
 
 22
 --and because Executive Branch decisions to grant or deny security clearances "may not be second-guessed by the courts," the courts "may not direct the Executive to grant or deny access to classified, compartmentalized information."
 
 
 23
 The United States relies primarily on Department of Navy v. Egan, 484 U.S. 518 (1988), and its progeny to support its proposition that "control of access to classified information is exclusively committed to the sole exercise of judgment by the Executive Branch." In Egan, the Supreme Court held that the Merit Systems Protection Board (Board) lacked authority to review a denial of a security clearance whereby a federal employee was automatically removed from his temporary position at a nuclear submarine base after his application for a required security clearance was denied. The Supreme Court stated that "the grant of security clearance to a particular employee [is] a sensitive and inherently discretionary judgment call [and] is committed by law to the appropriate agency of the Executive Branch." Egan, 484 U.S. at 526-27. The Supreme Court noted that, absent a controlling statute, the Executive has exclusive authority to "classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position ... that will give that person access to such information" (emphasis added) and that such authority originates in the United States Constitution, Art. II, Sec. 2. Section 2 provides that the "President shall be the Commander in Chief of the Army and Navy of the United States." The Supreme Court observed, even more broadly, that "unless Congress specifically has provided otherwise, courts have traditionally been reluctant to intrude upon the authority of the Executive in military and national security affairs." Egan, 484 U.S. at 530 (emphasis added). Because Congress did not specifically empower the Board to review the Executive's decision to deny a security clearance, the Supreme Court held that the Executive's decision was not reviewable by the Board. Egan, 484 U.S. at 530-32.
 
 II. The Contractor's Response
 
 24
 McDonnell Douglas and General Dynamics argue that Egan and derivative cases do not apply because Egan stands only for the "limited proposition" that absent a statute, the judiciary will not review an Executive decision concerning an individual's poor character or conduct in the context of granting or denying a security clearance. McDonnell Douglas and General Dynamics argue that the present case is instead controlled exclusively by the general authority of the Court of Federal Claims to manage discovery. Presumably, this argument is based on the authority granted to the judge in the Rules of the Court of Federal Claims. McDonnell Douglas and General Dynamics cite, as explanatory authority on such rule-based discovery powers, inter alia, Reynolds, 345 U.S. 1, Webster v. Doe, 486 U.S. 592 (1988), In re United States, 872 F.2d 472 (D.C.Cir.), cert. dismissed, 493 U.S. 960 (1989), and In re United States Department of Defense, 848 F.2d 232 (D.C.Cir.1988). McDonnell Douglas and General Dynamics assert that even in cases involving national security documents and information, a trial court does not lose all authority to review Executive determinations affecting the scope of what may be discovered. McDonnell Douglas and General Dynamics conclude that mandamus must therefore be denied in any case involving the discretionary authority of the Court of Federal Claims to manage any aspect of the conduct of discovery.
 
 
 25
 The problem with this argument, however, is its premise. The issue in this case does not involve the trial court's discretionary authority to manage discovery, usually by deciding what is discoverable. That authority is clear. See Florsheim Shoe Co. v. United States, 744 F.2d 787, 797 (Fed.Cir.1984) (stating that "[q]uestions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court"). Nor does the government question this authority. Rather, the issue is limited to the authority of the Court of Federal Claims to review the Secretary's determination under Executive Order 12356 to limit the number of persons who may access two Special Access Programs. The Secretary's determination does not limit what is discoverable in this case, but only how many individuals may have access to admittedly discoverable information.
 
 
 26
 Reynolds and the related cases relied on by McDonnell Douglas and General Dynamics involve invocation of the State Secrets Privilege to prevent discovery of certain documents and are therefore inapposite. In fact, they only highlight that here the United States is not so limiting the scope of discovery. Assertion of the State Secrets Privilege limits what information may be discovered by the United States' party opponent. Here, by not invoking the privilege, and by allowing discovery of all the requested materials, at least by 10 individuals, the United States clearly does not restrict what may be inspected.[3] At most, the Air Force decision affects only the pace of discovery, and that only marginally. To the extent plaintiffs impliedly argue that the quality of their review is diminished by the absence of a consultant, the Air Force answers that they could have made the consultant one of their 10 persons designated for access, as Secretary Rice's declaration explicitly required.
 
 
 27
 In any event, the State Secrets Privilege cases show, at a minimum, that the trial court does indeed lose authority over discovery of national security documents. The only exercise of authority that does remain is limited to an in camera review of the documents by the judge for the purpose of insuring that the privilege has been properly invoked. Even then, that review may occur only if the Secretary's declaration is seen as insufficient. In either case, the only issue for the judge is whether the privilege has been properly invoked. Where the privilege is properly invoked, the government's party opponent is not allowed to discover the materials. Indeed, in some cases, the threat to national security may be so great that "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." Reynolds, 345 U.S. at 10. Even if the case must therefore be dismissed, discovery is nevertheless blocked.
 
 
 28
 Similarly, we conclude that cases relied upon by McDonnell Douglas and General Dynamics involving the Freedom of Information Act (FOIA) are not applicable in deciding whether the Secretary of the Air Force's determination under Executive Order 12356 is judicially reviewable. In those cases, Congress specifically provided for limited judicial review of the Executive's determination by statute. No such statute is applicable to the Secretary's access determinations under Executive Order 12356.
 
 
 29
 For example, McDonnell Douglas and General Dynamics cite Lesar v. United States Department of Defense, 636 F.2d 472 (D.C.Cir.1980), as support for its argument that a trial court has discretion to examine the basis for a national security classification. Under FOIA, however, the government may only claim an "exemption" for documents by establishing that the documents are: (1) related to national defense or foreign policy, (2) authorized to be kept secret under criteria in an Executive Order, and (3) properly classified. 5 U.S.C. Sec. 552; see, e.g., Lesar, 636 F.2d at 481. Thus, the FOIA statute specifically places the burden on the government to sustain its action and impliedly authorizes the district court to review the documents, usually in camera, simply to determine whether they are in fact properly classified and therefore exempt. That statutory provision in FOIA cases destroys their relevance to this case, where there is no such statute. Moreover, plaintiffs do not challenge the validity of the classifications here. Nor could they.
 
 
 30
 III. Analysis of Egan and Separation of Powers Cases
 
 A. Egan
 
 31
 Having concluded that the cases relied upon by McDonnell Douglas and General Dynamics are inapposite and that Egan is not distinguishable, two questions arise: (1) whether a decision to deny access to a particular individual is legally any different from a decision under the very same Executive Order to deny access to any additional individuals and (2) whether Egan requires a conclusion that the Secretary's determination under Executive Order 12356 is no more reviewable by the judiciary than by the MSPB. We answer the first question negatively and the second question affirmatively.
 
 
 32
 First, the Executive's decision to deny a particular individual a security clearance is functionally identical to the Secretary's decision here to deny additional persons access to the classified Special Access Programs. In both instances, the decision is based essentially on the same factors. For example, the deciding official must weigh the importance of the information, the harm from disclosure, the acceptable level of risk to national security, and the potential for leaks or disclosures, including purely inadvertent ones. The only distinguishing factor between an individual's security clearance determination and the determination made in this case is that here the Secretary is not evaluating an individual's credibility or trustworthiness. This distinction, however, is not material, and hence does not remove our decision from the principle for which Egan stands. Indeed, that is why Egan discussed "access to information" as well as "an individual's" trustworthiness.
 
 
 33
 As noted above, the Supreme Court stated that "the grant of security clearance to a particular employee [is] a sensitive and inherently discretionary judgment call." Egan, 484 U.S. at 527. Noting that "[p]redictive judgment of this kind must be made by those with the necessary expertise in protecting classified information," the Supreme Court concluded that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." Egan, 484 U.S. at 529 (emphasis added). By speaking more broadly of "protection of classified information, and that this would "include" individual clearance decisions, the Court made clear that what was committed exclusively to the Executive was more than just whether an individual could be denied a security clearance.
 
 
 34
 Moreover, the Court noted that the general standard for security clearance determinations, i.e., whether grant of a security clearance would be "clearly consistent with the interest of national security," presumes no access in close cases and requires that only if the responsible official concludes that the access would be without significant risk may it be granted. The court emphasized that reaching such a predictive judgment is "an inexact science at best." Egan, 484 U.S. at 528-29. The Supreme Court concluded therefore that "it is not reasonably possible for an outside non-expert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." Egan, 484 U.S. at 527 (emphasis added). According to Egan, the expertise required for this type of determination, reinforced by the constitutional separation of powers, makes such a "predictive judgment" one exclusively for the Executive and therefore not reviewable by the Board. While, under Egan, such a determination arguably might not be exclusively for the Executive if Congress had enacted a statute allowing for some level of outside review and if that statute were held constitutionally permissible under separation of powers, no such issues are presented here for no statute even arguably applies. The decision here was based solely on the Secretary's authority under the Executive Order, which in turn derives exclusively from the constitutional grant of power to the Executive to command the military and conduct foreign affairs.
 
 
 35
 Here, the Secretary of the Air Force's determination that not more than 10 individuals shall have access to the programs reflected the constraints imposed on him as the responsible official under Executive Order 12356. As to Special Access Programs, section 5.3 of Executive Order 12356 provides:
 
 
 36
 Agencies that originate or handle classified information shall: ...
 
 
 37
 [c] establish procedures to prevent unnecessary access to classified information, including procedures that [i] require that a demonstrable need for access to classified information is established before initiating administrative clearance procedures, and [ii] ensure that the number of persons granted access to classified information is limited to the minimum consistent with operational and security requirements....
 
 
 38
 (Emphasis added.)
 
 
 39
 We conclude that the Secretary of the Air Force's determination that not more than 10 individuals should have access to the programs at issue herein is exactly the same kind of "predictive judgment" that was at issue in Egan. Egan, 484 U.S. at 529. Just as "predictive judgment" was determined in Egan to be not reviewable by the non-expert Board, we conclude that the Secretary's predictive judgment in this case is not reviewable by the non-expert Court of Federal Claims (or the non-expert Court of Appeals for the Federal Circuit, for that matter). Moreover, the Executive Order specifically directs the Secretary to limit access as much as possible. It makes him solely responsible for protecting the national security data. Implicit in Egan was the notion that because both "responsibility" and "expertise" reside exclusively in the service secretary, no "outside" review was authorized by law, at least absent a clear statutory command to the contrary. That was so even as between agencies within the Executive Branch: the Navy and the Board. A fortiori, it is so as between different Branches.
 
 
 40
 The findings made by the Court of Federal Claims in this case clearly indicate the wisdom of precluding review by a non-responsible, non-expert, outside body. The judge found, for example, that "[d]efendant has provided the court no reasons other than 'national security' for not admitting two additional people to the Air Force programs." A cursory review of the Secretary's declaration, however, indicates that the government has not merely cited "national security." Rather, the Secretary recited specifically what harm would befall United States national security and the safety of its armed forces personnel. For example, in addition to the expressed danger to U.S. air crews, the Secretary pointed out that if our stealth technology be compromised, "[t]he United States has very limited capability to counter this technology, should it be developed and used against us by a foreign country."
 
 
 41
 Similarly, the judge found that "[n]o reasons appear to the court why 10 trustworthy persons with security clearances present no threat to national security while 12 trustworthy persons with security clearances might." (Emphasis added.) This finding also misreads the Secretary's declaration. By allowing only 10 individuals access to the programs, the Secretary did not determine that 10 individuals posed "no threat" to national security. Rather, he merely determined that disclosure to 10 people was the maximum tolerable risk to national security. That he gave "no reasons" is entirely unsurprising since to do so would require extensive discussion of highly technical stealth data and vulnerability assessments which, in addition to being beyond the competence of generalist judges, are themselves extremely highly classified.
 
 
 42
 Moreover, just as there was no controlling statute in Egan allowing for Board review, there is no controlling statute in this case allowing for Court of Federal Claims review. The only law applicable here is Executive Order 12356. That Executive Order is in the "series of Executive Orders" applicable in Egan, which "have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch." Egan, 484 U.S. at 528. Executive Order 12356 authorizes service secretaries to grant access; it gives no such authority to judges. Thus, we conclude that the Court of Federal Claims does not have any lawful authority, statutory or otherwise, to review and reverse the Secretary of the Air Force's determination as to the number of persons given access to the two Special Access Programs here, both classified under Executive Order 12356.
 
 B. Separation of Powers
 
 43
 General case law concerning the separation of powers doctrine further supports our conclusion. See, e.g., New York v. United States, 112 S.Ct. 2408, 2431 (1992) ("The Constitution's division of power among the three Branches is violated where one Branch invades the territory of another."). See also Lujan v. Defenders of Wildlife, 112 S.Ct. 2130, 2136 (1992) ("[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts.").
 
 
 44
 As noted above, the Executive's "authority to classify and control access to information bearing on national security" is based upon the President's constitutional power as the "Commander in Chief of the Army and Navy of the United States." Egan, 484 U.S. at 527. Because this power is rooted in the Constitution, separation of powers is implicated and bars judicial review of any exercise of that power, at least where, as here, no specific statute purports to provide to the contrary. Therefore, consistent with Egan, the judiciary may not review the present access determination made under Executive Order 12356.
 
 
 45
 Indeed, at least two courts have held that the reasoning in Egan and Webster[4] supports the conclusion that, under separation of powers, security clearance determinations are not judicially reviewable, at least not without a clear, strong declaration from Congress. See Dorfmont v. Brown, 913 F.2d 1399, 1401 (9th Cir.1990), cert. denied, 111 S.Ct. 1104 (1991) (Egan's analysis "applies no less to the federal courts than to the MSPB. When it comes to security matters, a federal court is 'an outside nonexpert body.' "); Guillot v. Garrett, 970 F.2d 1320, 1325 (4th Cir.1992) (stating that an "unmistakable expression of purpose ... would be required to support a conclusion that Congress intended to subject the Executive's security clearance determinations to scrutiny"). See also Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 95, 111 ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.").
 
 
 46
 The same reasoning applies to the Court of Federal Claims. Whether that court is considered an Article I or an Article III court, the access decisions of the Executive may not be countermanded by either coordinate Branch. Thus, we conclude that the Secretary of the Air Force's determination under Executive Order 12356 concerning the number of persons who shall have access to the programs is not reviewable by the Court of Federal Claims.
 
 C. Future Litigation of This Case
 
 47
 The court's control over the scope of discovery, however, remains undiminished. The panoply of enforcement tools given to the trial court under the rules and the case law also remains available.
 
 
 48
 The parties are hereby specifically notified that they should not contemplate resolving routine discovery disputes--those not involving lack of judicial authority--by resort to mandamus. Normally, of course, discovery rulings are not subject to review by mandamus.
 
 
 49
 We note with dismay that most of both parties' submissions were devoted not to dispassionate exposition of the dispositive legal issue, but rather to heated reciprocal charges of bad faith, past foot-dragging in discovery, predictions about vast increases in future discovery requests or unreasonable opposition thereto and other clearly extraneous or speculative matters. A more disciplined and professional approach by all counsel will be required if this case is to proceed properly.
 
 
 50
 Finally, the trial court will have to find ways to manage the pace of discovery that do not usurp the power to grant access to classified, compartmented data. Under the Executive Order, the only legal authority applicable here, such access decisions are exclusively for the Executive or his delegatee. Perhaps the circumstances under which the 10 authorized individuals review the documents in the two Special Access Programs can be made more efficient. We have confidence the trial court can find means that do not breach the Separation of Powers or contravene Egan.
 
 CONCLUSION
 
 51
 Mandamus is traditionally used, inter alia, to confine a trial court "to a lawful exercise of its prescribed jurisdiction...." Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289 (1988). But the party seeking mandamus must show that the right to the issuance of a writ is "clear and indisputable." Id. We conclude that the United States has shown that the Court of Federal Claims did exceed the "lawful exercise of its prescribed jurisdiction" and that the United States has shown its right to the requested relief to be "clear and indisputable."
 
 
 52
 Accordingly,
 
 IT IS ORDERED THAT:
 
 53
 The United States' petition for writ of mandamus is granted. The Court of Federal Claims is directed to vacate its March 5, 1993 order.
 
 
 
 [1]
 The United States moves for leave to file a reply, with reply attached. McDonnell Douglas and General Dynamics move for leave to file a sur-reply, with sur-reply attached. We grant the motions
 
 
 [2]
 McDonnell Douglas and General Dynamics state that the two additional persons already have security clearances at high enough levels, although of course they do not presently have grants of access to the two Special Access Programs
 
 
 [3]
 For similar reasons, we do not find applicable cases involving motions to dismiss that were based, inter alia, on the government's assertion that without dismissal classified documents could be disclosed. See, e.g., Webster, 486 U.S. 592; In re United States, 872 F.2d 472. Those cases relied on Reynolds and discussed the ability of a trial court to determine, to a limited degree, whether discovery of classified documents was permissible as an alternative to dismissing the case because adequate precautions could be instituted to protect state secrets from public disclosure
 
 
 [4]
 In Webster, the Supreme Court concluded that there was no authority under the Administrative Procedure Act to review a termination of a Central Intelligence Agency employee on the ground of a potential "threat to security." Webster, 486 U.S. at 595, 601. The Supreme Court concluded that the agency's termination decision was "committed to agency discretion by law" and was thus not reviewable. Webster, 486 U.S. at 600-01 ("[W]e see no basis on which a reviewing court could properly assess an Agency termination decision.")