**KEMET ELECTRONICS CORPORATION, Vishay Intertechnology, Inc., Cornell Dubilier, Inc., Aerovox Corp., Barker Microfarad, Inc., collectively,**

**Passive Electronics Coalition, Plaintiffs,**

**v.**

**Charlene BARSHEFSKY, United States Trade Representative, and George Weise, Commissioner of Customs, Defendants.**

**Slip Op. No. 97–115.**
**Court No. 97–06–00930.**

United States Court of International Trade.

Aug. 19, 1997.

Porter, Wright, Morris & Arthur (Richard M. Markus, David C. Tryon, Leslie A. Glick and Bart Fisher), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeffrey M. Telep), Susan G. Esserman, General Counsel, and Hal Shapiro, Assistant General Counsel, Office of the United States Trade Representative, and Ellen Daly, Office of the Chief Counsel, United States Customs Service, of counsel, Washington, DC, for defendants.

Democratic Trade Counsel (Gregg Elias), Washington, DC, for Senator Ernest F. Hollings, amici curiae.

Dewey Ballantine (Alan Wm. Wolff, Michael H. Stein, and Elizabeth A.B. McMorrow), Washington, DC, for Semiconductor Industry Association, amici curiae.

Wilmer, Cutler & Pickering (John Greenwald), Washington, DC, for Information Technology Industry Council, amici curiae.

## OPINION

RESTANI, Judge.

Plaintiffs Kemet Electronics Corp., *et al.* (collectively, "the Passive Electronics Coalition"), seek a preliminary injunction against defendants, United States Trade Representative Charlene Barshefsky ("USTR") and Commissioner of Customs George Weise, to enjoin the reduction and eventual elimination of tariffs on capacitors and resistors as part of the Information Technology Agreement ("Agreement") negotiated by the USTR under the auspices of the World Trade Organization ("WTO"). Plaintiffs contend that the authority to proclaim tariff reductions delegated by Congress to the President under the Uruguay Round Agreements Act ("URAA") is unconstitutionally broad or, alternatively, that the President exceeded his delegated authority when he proclaimed the staged elimination of tariffs on capacitors and resistors. Defendants move to dismiss the complaint pursuant to USCIT Rule 12(b)(1) and (5), claiming that this court lacks subject matter jurisdiction and plaintiffs fail to state a claim upon which relief can be granted.

## BACKGROUND

Capacitors and resistors are passive electronic components that perform integral functions in the operations of most electrical systems, including computers, communication devices, consumer electronics, automobiles, and industrial equipment. *See* International Trade Comm'n, *Advice Concerning the Proposed Modification of Duties on Certain Information Technology Products and Distilled Spirits*, Pub. No. 3031 at 5–30 (Apr. 1997) (report to President) [hereinafter "*ITC Report*"]. Capacitors and resistors have many uses due to their electrical characteristics and are used frequently in concert with semiconductors to construct a functional circuit on a printed circuit board. *Id.* They are largely produced and consumed in those countries that produce electronic systems—the United States, the European Union, Japan, and various other Asian countries. *Id.*

During the Uruguay Round of multilateral trade negotiations, the United States negotiated a series of reciprocal agreements to reduce tariff and non-tariff barriers to trade. The results of the Uruguay Round were implemented in two ways. Tariff reductions that were within the limits of the proclamation authority that had been delegated to the President by the Congress under 19 U.S.C. § 2902(a)(2)(A) (1994) were implemented by proclamation without further Congressional action. Agreements to reduce tariffs beyond the limits in the President's proclamation authority, and non-tariff barrier agreements, were implemented by "fast track" legislation under 19 U.S.C. § 2903 (1994). "Fast track" implementation of Uruguay Round tariff rate reductions that exceeded the duty reductions which the President was authorized to pro-

claim is expressly provided for by 19 U.S.C. § 2902(a)(6) (1994).

Recognizing the interest of the United States in concluding negotiations that were not completed at the time the Uruguay Round ended, Congress delegated to the President authority under Section 111(b) of the URAA (codified as 19 U.S.C. § 3521(b)) to proclaim the elimination of tariffs if their elimination is provided for by "multilateral negotiation under the auspices of the WTO" and the tariff elimination applied to "the rate of duty on an article contained in a tariff category that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations." 19 U.S.C. §§ 3521(b)(1)(A),(B) (1994); see also 108 Stat. 4819, 4819–20 (1994). The proclamation authority of Section 111(b) was, in another respect, broader and, in one respect, narrower than the tariff proclamation authority that had been delegated to the President under 19 U.S.C. § 2902(a)(2)(A) for purposes of implementing the results of the Uruguay Round. Section 111(b) eliminated the restrictions on the degree of tariff modifications that could be proclaimed, but further restricted the articles for which tariff rate changes could be proclaimed.[1] 19 U.S.C. § 3521; 108 Stat. at 4819–20.

At the first Ministerial Conference of the World Trade Organization in December 1996, the United States and 27 other countries concluded negotiation of the *Ministerial Declaration on Trade in Information Technology Products* (commonly referred to as the "Information Technology Agreement"), which provides for "zero-for-zero" tariff rate concessions on over $500 billion in annual global trade in electronic products. *Ministerial Declaration on Trade in Information Technology Products*, Dec. 13, 1996, 36 I.L.M. 375, 383 (1997) [hereinafter "Agreement"]; see also Renato Ruggiero, Statement Issued to WTO Information and Media Relations Division, Press Release No. 69 at 1 (Mar. 3, 1997); Defs.' Attachment O. As part of its commitments under the Agreement, the United States agreed to the staged elimination of tariffs on capacitors and resistors over a four year period. *See Agreement*, 36 I.L.M. at 385.

Prior to the Presidential Proclamation challenged herein, there was a 9.4% *ad valorem* tariff on the importation of capacitors under Item No. 8532 of the Harmonized Tariff Schedule of the United States, USITC Pub. 3001, Sec. XVI, ch. 85, at 49 (1997) [hereinafter "HTSUS"].[2] HTSUS Item No. 8533 imposed a 6% *ad valorem* tariff on the importation of resistors.[3] *Id.* at 50. The USTR announced on December 13, 1996 that the United States would reduce these tariffs by 25% each year starting on July 1, 1997 and would completely eliminate such tariffs by January 1, 2000. *See Agreement*, 36 I.L.M. at 385, 388. The Agreement came into effect by Presidential Proclamation, dated June 30, 1997. Proclamation No. 7011, 62 Fed.Reg. 35,909 (1997).

Plaintiffs own and operate manufacturing facilities in the United States for the production and sale of electronic capacitors and

---

1. Section 2902, Title 19 of the United States Code authorized "the President to enter into trade agreements with foreign countries and to proclaim modifications in U.S. rates of duty necessary or appropriate to carry out such agreements," subject to some limitations, including that duty reductions cannot exceed 50 percent, except that duties of 5 percent *ad valorem* or below may be reduced to zero. *See* H.R.Rep. No. 103–826(7), at 27 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3799. "Section 111(b) [of the URAA] provides the President proclamation authority to complete 'zero-for-zero' tariff elimination, as well as accelerated staging of rate reductions and rate harmonization in those sectors where these U.S. objectives could not be achieved in the Uruguay Round negotiations." *Id.* at 3800–01. Section 111(b) limited the President's proclamation authority to "the modifica-

tion of any duty or staged rate reduction set forth in Schedule XX if the United States agrees to the modification or reduction in a WTO multilateral negotiation and it applies to the duty on an article in a tariff category that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round." *Id.* at 3799–3800.

2. In the HTSUS, heading 8532 has nine 8-digit subheadings. Except for the one subheading covering parts of capacitors, all others were subject to the 9.4% *ad valorem* tariff. *See id.*

3. Depending on the subheading, the MFN tariff rate for resistors was alternatively 5.3%, 4.2% or zero ad valorem. *Id.* at 50–51

resistors. Plaintiffs seek to enjoin the reduction of the tariffs on capacitors and resistors. Defendants filed a motion to dismiss.

## DISCUSSION

### I. Preliminary Injunction

■ In determining whether to grant a preliminary injunction, the court must balance four factors: 1) the threat of immediate, irreparable harm to plaintiffs; 2) the likelihood of success on the merits; 3) whether the public interest would be better served by issuance of a preliminary injunction; and 4) whether the balance of hardships favors plaintiffs. *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir.1983).

At the outset, the defendants argue that plaintiffs are not entitled to injunctive relief due to their delay in bringing this action. The defendants claim that the fact that plaintiffs waited six months after they believed their cause of action accrued before filing their complaint refutes their claim for injunctive relief. *See, e.g., High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed.Cir.1995) (finding 17–month delay militated against issuance of preliminary injunction in patent infringement case); *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.,* 821 F.2d 646, 648 (Fed.Cir.1987) (15–month delay plus grant of licenses by patentee sufficient to overcome presumption of irreparable harm). As plaintiffs knew that capacitors and resistors were included in the Agreement as early as December 13, 1996, and yet did not file their complaint until June 2, 1997, the defendants contend that this fact alone constitutes a basis for denying plaintiffs' request for a preliminary injunction.

■ Plaintiffs claim that they were seeking non-judicial remedies, such as meeting with the USTR and her staff, during the six month period between their discovery that capacitors and resistors were included within the Agreement and the filing of their complaint. *See* Compl. ¶ 9, at 3. As this six-month delay did not prejudice defendants, the court finds that plaintiffs' delay in filing their complaint, by itself, does not constitute a sufficient basis for denying plaintiffs injunctive relief.

### A. The Threat of Immediate, Irreparable Harm

■ To prevail on a motion for preliminary injunction, plaintiffs have the burden of producing "probative evidence" to demonstrate a threat of immediate, irreparable harm. *National Hand Tool Corp. v. United States,* 14 CIT 61, 66 (1990).

> Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined. A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown.

*S.J. Stile Assocs. Ltd. v. Snyder,* 68 C.C.P.A. 27, 646 F.2d 522, 525 (C.C.P.A.1981) (citations omitted).

Plaintiffs claim that a 25% reduction in the current tariffs on capacitors and resistors will dramatically harm U.S. manufacturers by allowing foreign manufacturers to export their products to the United States without paying the current duties. Plaintiffs assert that capacitors and resistors are generally produced in very high volumes in order optimally to reduce price as competition for sales is highly price-sensitive. *See ITC Report* at 5–30, 5–36. As a result, plaintiffs state that many producers have become highly specialized and produce only a limited number of types of capacitors or resistors. *See id.* at 5–33 to 5–34. Plaintiffs also assert that domestic producers have high labor costs relative to many foreign producers of electronic components and thus face a relative disadvantage in production costs. *See id.* at 5–37. Plaintiffs claim that the U.S. capacitor and resistor manufacturing industry is attempting to compensate for its increased labor costs with automation and production sharing, but that it cannot completely offset higher labor costs. *See id.*

As sales of these products are extremely price sensitive, plaintiffs assert that a 25% duty reduction will have disastrous consequences for them, but admit that they cannot

determine the precise impact on their sales and profits. Plaintiffs claim that this difficulty in quantifying damages from lost business further supports injunctive relief. As specific examples, plaintiffs have provided testimony and affidavits stating the following:

a. Kemet Electronics Corp. estimates that the results of the tariff reductions for the fiscal year 1997 would be a $13,000,000 loss in revenue and pre-tax profit and a $8,900,000 loss (a 23% reduction) in net income. *See* Poinsette Aff. ¶ 16, at 5 & Ex. 1, at 2; Pls.' Mot. for TRO, Ex. C.

b. Barker Microfarad, Inc., a producer of aluminum capacitors, estimates that in the first year after the initial tariff reduction it will lose approximately $1,171,000 in annual sales (approx. 10% of present sales) with the related loss of 25 (out of 250) jobs. *See* Poole Aff. ¶ 7(a) at 2; Pls.' Mot. for TRO, Ex. A.

c. Cornell Dublier Electronics estimates that the phase-out of the tariffs will cause a $570,000 loss in 1998 sales and profit losses of $86,000. *See* Kaplan Aff. ¶ 7, at 2; Pls.' Mot. for TRO, Ex. B.

d. Vishay Intertechnology, a resistor manufacturer, predicts that as a result of the tariff reduction and eventual elimination it will experience pressure from foreign competitors and will be forced to cut labor costs by transferring jobs from the U.S. to a low labor cost country. *See* Eden Test., Hr'g Tr. at 55–56 (July 10, 1997).

Plaintiffs claim that they will each suffer damage similar to these examples as a result of the tariff reductions.

Furthermore, plaintiffs contend that the tariff reductions will greatly exacerbate inroads that foreign capacitor and resistor manufacturers have made in the U.S. market in recent years. Plaintiffs claim that the number of U.S. owned and operated manufacturers of these products has been shrinking steadily and the proposed tariff elimination will provide further advantage for foreign manufacturers who seek to control the U.S. market. *See, e.g., ITC Report,* at Ex. F–2 to F–9 (letters from domestic manufacturers of resistors and capacitors); Pls.' Br. in Support of Mot. for TRO at 7. Plaintiffs maintain that they have faced a continuing erosion of their market share in favor of Japanese manufacturers who they claim garner U.S. market share by charging less than market prices here while their government permits Japanese markets to be closed to foreign competition, preventing plaintiffs from selling there.

Plaintiffs further assert that once jobs and related skills are lost in the United States, regaining them in the future will be extremely difficult. Plaintiffs argue that the jobs that move overseas are inevitably accompanied by the technology for manufacturing these products and within a few years after those countries gain these jobs, they will develop the necessary engineering and training skills to fully support the manufacture of capacitors and resistors. Even if the United States were later able to become sufficiently price competitive to bring the manufacturing jobs back, plaintiffs claim that manufacturers would have to start from scratch in rebuilding the industry. Plaintiffs maintain that these losses will be permanent and irreparable.

Moreover, plaintiffs argue that if the tariff reductions go forward, but are ultimately held invalid, they will have no recourse against anyone for their lost sales and profits. They also assert that any workers who have lost their jobs as a result of lost sales will likewise have no recourse. Plaintiffs contend that irreparable harm from lost business supports immediate injunctive relief. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995)(noting that courts have found irreparable harm where party threatened with the loss of a business).

■ Despite plaintiffs' contentions of the general harm they will suffer as a result of the 25% tariff reduction, the court finds that plaintiffs have failed to produce sufficiently probative evidence to demonstrate the threat of actual, immediate, irreparable harm, rather than simply prospective harm. *See National Hand Tool Corp.,* 14 CIT at 66. Plaintiffs assume that a reduction in the tar-

iffs on capacitors and resistors will necessarily result in a reduction in import prices by an equal amount, but present weak evidence to support this assumption. Moreover, plaintiffs do not take into account the possibility that if capacitor or resistor prices are in fact lowered, there may be some increase in demand that may offset the impact of lower prices. As the ITC Report indicates, demand for capacitors and resistors is closely related to the sales of various kinds of electronic components in which they are utilized. *See ITC Report* at 5–39 to 5–40. The trend in the U.S. market for capacitors and resistors over the last four years has been one of growth, from $2.1 billion in 1992 to $2.4 billion in 1996. *Id.* at 5–40. Plaintiffs have presented no compelling evidence to contradict evidence of this trend given the ITC's prediction that the Agreement's duty elimination "is likely to result in increased market access opportunities." *See id.* Furthermore, plaintiffs ignore the fact that the Agreement will reduce tariffs on capacitors and resistors in export markets such as Taiwan, Malaysia, Korea, Canada, the European Union, India, Australia, Singapore, New Zealand, and Turkey. *See id.* at 5–40 to 5–43 (*e.g.*, without the Agreement, imports would be dutiable at rates ranging from 40% in India and Indonesia, 13% in Korea, and 10% in Singapore). Accordingly, the court finds that although plaintiffs have made a showing of some *prospective* harm, plaintiffs have failed to demonstrate serious *actual* harm which cannot be undone before the merits of the case are determined.

In discussing the four factors the court analyzes to determine whether injunctive relief should be granted, the Federal Circuit has stated that,

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor

may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). Although plaintiffs' weak showing of the threat of immediate, irreparable harm may be dispositive, the court will consider the remaining factors.

### B. *Likelihood of Success on the Merits*

In *Kemet Electronics Corp. v. United States,* 969 F.Supp. 82 (Ct. Int'l Trade 1997), the court determined that plaintiffs were unlikely to prevail on their argument that Congress' delegation of law-making power to the President was unconstitutional because Congress had imposed no time limit in the URAA on presidential tariff-reducing authority and because the other purported limitations on such authority are so expansive. *Id.* at 88–90, 969 F.Supp. at 85–86. As plaintiffs have not presented new arguments which would cause the court to reconsider this conclusion, the court finds that plaintiffs remain unlikely to succeed based on this argument. Similarly, plaintiffs do not present new arguments which alter the court's view that the statutory consultation and layover requirements of 19 U.S.C. § 2155 and 19 U.S.C. § 3524 were met. *See id.* at 86–88.

As to whether the USTR acted within the President's authority to proclaim the proposed tariff reductions, plaintiffs argue that because the government has exclusive control over any evidence of its "secret" communications with its negotiating partners or foreign nations the government shoulders the burden of proving that it conducted "reciprocal duty elimination.. negotiations" for capacitors and resistors pursuant to 19 U.S.C. § 3521(b)(1)(B) (1994).[4] *See Williams v. Administrator of NASA,* 59 C.C.P.A. 1329, 463

---

**4.** Section 3521(b)(1)(B) provides,

(b) Other tariff modifications

Subject to the consultation and layover requirements of section 3524 of this title, the President may proclaim—

(1) the modification of any duty or staged rate reduction of any duty set forth in Schedule XX if—

. . .

(B) such modification or staged rate reduction applies to the rate of duty on an article contained in a tariff category that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations.

19 U.S.C. § 3521(b)(1)(B).

**1020**

F.2d 1391, 1400 (C.C.P.A.1972) ("[W]here a party is in a position to have peculiar knowledge of the facts with regard to an issue, the burden of proof as to that issue lies upon that party.") (citing McCormick, *Evidence,* § 337 (2d ed.1972)).

Section 111(b) of the URAA (codified as 19 U.S.C. § 3521(b)) authorizes the President to modify duties on articles in tariff categories that were the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations. Plaintiffs assert that capacitors and resistors, however, were not contained within the list of "zero-for-zero" tariff elimination initiatives proposed by the USTR during these negotiations. In connection with the denial of plaintiffs' motion for a temporary restraining order, the court concluded that documents presented by defendants, including the March 15, 1990 *U.S. Proposal for Uruguay Round Market Access Negotiations*[5] (hereinafter *"U.S. Proposal"*) and correspondence from the government of Canada,[6] supported the conclusion that the "tariff category" at issue was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations. *Kemet Elecs. Corp.,* 969 F.Supp. 82, 88–89. Defendants, however, did not present any witnesses or further evidence to support this conclusion at the preliminary injunction hearing. Under these circumstances, plaintiffs argue that the court can and should infer that defendants cannot support this contention for which they have the burden of proof.

■ The *U.S. Proposal* does support defendants' position, although not conclusively so, and plaintiffs have not presented evidence to contradict the inferences defendants draw from the proposal. Accordingly, the court finds that, thus far, plaintiffs appear unlikely to succeed on the merits of their claim that capacitors and resistors were not included in

a tariff category that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations.

### C. The Public Interest

■ Plaintiffs have provided no further argument or evidence to contradict the court's initial conclusion that the public interest favors denying plaintiffs' motion for injunctive relief given the important foreign relations concerns of the United States and the potential harm to the Agreement as a whole. *See Kemet Elecs. Corp.,* 969 F.Supp. 82, 88–89. This factor favors delaying any relief until this matter is finally concluded.

### D. Balance of Hardships

■ Plaintiffs claim that defendants rely entirely on assertion and argument to support their claim that the government suffers the balance of hardships. Plaintiffs assert that defendants have exclusive control over any evidence of what effect a preliminary injunction regarding U.S. tariffs on capacitors and resistors would have on any other nation's tariffs for capacitors and resistors or for any other nation's participation in the Agreement as a whole. To support its contentions of hardship in connection with the motion for a temporary restraining order, defendants submitted the declaration of Ambassador Jeffrey Lang, the Deputy USTR, which provides Lang's assessment of the hardships the United States, the other parties to the Agreement, and the Agreement as a whole would face if injunctive relief is granted. Decl. of Lang, at 1–3. Although defendants did not offer Ambassador Lang as a witness at the preliminary injunction hearing, the court notes that plaintiffs did not seek to depose him prior to the hearing or to delay the hearing for this purpose, nor did they produce evidence which contradicts the governmental concerns expressed by the

---

**5.** The *U.S. Proposal* also makes clear that during the Uruguay Round the USTR intended to "explore duty-free sectoral approaches as part of the overall market access negotiations," even where proclamation authority was lacking. *See U.S. Proposal;* Defs.' Attach. D. This included parts of the electronics sector. *Id.* at 5. Chapter 85 of the HTSUS, which includes the tariff categories

at issue is listed as available for negotiation on reciprocal duty eliminations. *Id.*

**6.** Plaintiffs challenge the admissibility of this document. The court does not reach this issue, as the otherwise admissible evidence supports defendants' view.

ambassador. Plaintiffs were aware that defendants did not plan to present any witnesses at least two days prior to the hearing. Under these circumstances it appears appropriate to consider the matters asserted in the declaration. The court finds that Lang's declaration and the lack of any evidence contradicting it provides adequate support for defendants' claim that the balance of hardships favors denying injunctive relief. Plaintiffs' weak evidence of immediate harm is outweighed by the harm which would likely result from reneging on an international commitment. Consequently, the court denies plaintiffs' motion for a preliminary injunction.

## II. Motion to Dismiss

Defendants move to dismiss the complaint, arguing that the Presidential Proclamation implementing the Agreement is not subject to judicial review, plaintiffs lack standing, and plaintiffs have failed to state a claim upon which relief can be granted.

### A. Judicial Review

Plaintiffs allege that "defendants' actions in causing or permitting those purported tariff reductions or eliminations adversely affect or aggrieve these plaintiffs within the meaning of 28 U.S.C. § 2631(i)." Compl. ¶ 11, at 3. Section 2631(i) defines standing for purposes of an action under 28 U.S.C. § 1581(i) by reference to Administrative Procedures Act ("APA"), 5 U.S.C. § 702. Section 2631(i), Title 28 of the United States Code provides,

> Any civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)-(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5.

28 U.S.C. § 2631(i) (1994). Section 702, Title 5 of the United States Code provides in relevant part that,

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a

court of the United States seeking relief other than money damages or stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (1994). Section 704 of the APA in relevant part, however, permits judicial review only of final agency actions. Id. § 704 (1994).

Defendants argue that judicial review of plaintiffs' claims is unavailable as courts have uniformly held that when Congress grants the President the final authority to act pursuant to a statutory mandate, subordinate actions and recommendations by an executive branch agency do not constitute final agency action within the meaning of the APA. See, e.g., Franklin v. Massachusetts, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). In Franklin, plaintiffs challenged the methodology by which overseas federal employees were allocated to states in the 1990 census, which, in turn, impacted how seats in the House of Representatives would be reapportioned. Id. at 790–91, 112 S.Ct. at 2770–71. Under the applicable statute, the Secretary of Commerce is required to perform the census and report the results to the President, who within nine months is required to submit a statement to Congress indicating the number of Representatives to which each state is entitled based on the census data. Id. at 792, 112 S.Ct. at 2771. The plaintiffs sued the President, the Secretary of Commerce, a Census Bureau official, and other officials seeking injunctive and declaratory relief. Id. at 790, 112 S.Ct. at 2770.

In deciding whether judicial review under the APA was available, the Supreme Court looked to whether the "final" action that plaintiffs challenged was that of an "agency." Id. at 796, 112 S.Ct. at 2773. In making this determination, the Court stated that it has looked to, among other things, "whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on ... day-to-day business.'" Id. at 796–97, 112 S.Ct. at 2773 (quoting Abbott Labs. v. Gardner, 387 U.S.

136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967)). The Court further stated that, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* at 797, 112 S.Ct. at 2773. The Supreme Court held that APA review of the Secretary of Commerce's census findings was unavailable because the report by the Secretary was not a final agency action and the action challenged was that of the President, who is not an agency under the meaning of the APA. *See id.* at 800–01, 112 S.Ct. at 2775–76. Although the Court left open the question whether the President might be subject to judicial injunction requiring the performance of a purely "ministerial" duty, the Court concluded that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 802–03, 112 S.Ct. at 2776 (quoting *Mississippi v. Johnson,* 4 Wall. 475, 71 U.S. 475, 18 L.Ed. 437 (1867)).

In the subsequent case of *Dalton v. Specter,* 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), the Supreme Court held that the recommendations submitted by the Secretary of Defense and the Defense Base Closure and Realignment Commission to the President were not subject to judicial review under the APA as the recommendations did not constitute final agency action. *Id.* at 476–77, 114 S.Ct. at 1727–28. The Court held that the action that "will directly affect" the military bases is taken by the President when he submits his certificate of approval of the recommendation to Congress. *Id.* at 469, 114 S.Ct. at 1724 (quoting *Franklin,* 505 U.S. at 797, 112 S.Ct. at 2773–74). As the Court determined in *Franklin* that the President is not an "agency" for purposes of the APA, review of the President's action with regard to this base closing under the APA was not available. *Id.* at 470, 114 S.Ct. at 1724–25.

Finally, defendants cite to the District of Columbia Circuit's opinion in *Public Citizen v. United States Trade Representative,* 5 F.3d 549 (D.C.Cir.1993), as support for the proposition that the USTR's actions in negotiating the Agreement are not final agency actions because although the USTR completed negotiations on the trade agreement,

Agreement will have no effect on plaintiffs unless and until the President acts. In *Public Citizen,* the plaintiff sought to compel the USTR to prepare an environmental impact statement for the North American Free Trade Agreement ("NAFTA"). *Id.* at 550. The court stated that "[t]he President is not obligated to submit any agreement to Congress, and until he does, there is no final action. If and when the agreement is submitted to Congress, it will be the result of action by the President, action clearly not reviewable under the APA." *Id.* at 551–52. Accordingly, the court held that the USTR's refusal to produce the environmental impact statement was not subject to judicial review as the "final agency action" challenged was the submission of NAFTA to Congress by the President, which is unreviewable under the APA. *Id.* at 553.

In the instant case, defendants claim that the USTR has similarly not taken any final agency action that would permit review under the APA or 28 U.S.C. § 1581(i). Instead, defendants assert that Congress reserved this responsibility exclusively for the President, providing that "*the President* may proclaim—(1) the modification of any duty or staged rate reduction of any duty set forth in Schedule XX." 19 U.S.C. § 3521(b) (emphasis added). Unless and until the President exercises this discretionary authority, defendants maintain that the Agreement will not be implemented and tariffs on information technology will not be reduced. Defendants argue that it is only the President's Proclamation that "will directly affect the parties" and, thus, the USTR's conduct in negotiating the Agreement is not subject to judicial review.

Plaintiffs also named the Commissioner of Customs as a defendant. Defendants argue, however, that no Customs "decision" has been placed in issue by plaintiffs' complaint. Plaintiffs are domestic interested parties who contend that the rate of duty to be charged on imported capacitors and resistors will be too low. Defendants assert that under the controlling case law, plaintiffs cannot obtain judicial review of the President's Proclamation through the "back door" by challenging Customs' ministerial action of not collecting duties on capacitors and resistors. *See Unit-*

ed States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 200–01, 544 F.Supp. 883, 886–87 (holding that suit against the Customs Service under 28 U.S.C. § 1581(a) would be untenable, as Customs lacked the authority to grant relief from the Presidential Proclamation imposing a sugar quota), aff'd, 69 C.C.P.A. 172, 683 F.2d 399 (C.C.P.A. 1982). Defendants contend that as it is the Presidential Proclamation that sets the tariff rates at issue, rather than any action by the USTR or the Customs Commissioner, as any action by subordinate officials would not constitute final agency action.

Defendants, however, misread United States Cane Sugar Refiners' Association. The court did not dismiss the suit for lack of standing or jurisdiction. Instead, the court found it unnecessary for plaintiffs to exhaust their administrative remedies by first attempting to make an entry of sugar only to have it denied by Customs and unreasonable to force plaintiffs to challenge the validity of the Presidential Proclamation via a protest to Customs. Id. at 200–01, 544 F.Supp. at 886–87. As Customs officials had no authority to override the Presidential Proclamation and admit the over-quota sugar, the court found exhaustion of administrative remedies to be futile under the circumstances and jurisdiction pursuant to 28 U.S.C. § 1581(i), rather than 28 U.S.C. § 1581(a). Id. at 201, 544 F.Supp. at 887; see also United States Shoe Corp. v. United States, 114 F.3d 1564, 1570–71 (Fed.Cir.1997) (holding that as the collection of the Harbor Maintenance Tax does not involve a protestable decision on the part of Customs, jurisdiction did not arise under 28 U.S.C. § 1581(a), but rather under 28 U.S.C. § 1581(i)).

Plaintiffs have not invoked the APA as the basis for this court's jurisdiction. Instead, plaintiffs rely upon 28 U.S.C. § 1581(i)(2) (1994) (providing that "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—... (2) tariffs, duties, fees, or other taxes on the importation of

merchandise for reasons other than the raising of revenue") and 28 U.S.C. § 2201(a) (1994) (providing that "any court of the United States ... may declare the rights and other legal relations of any interested party").

Defendants contend that neither of these statutes provides a cause of action nor an explicit waiver of sovereign immunity necessary for plaintiffs' challenge to the President's authority to issue the proclamation implementing the Agreement. In the light of the Supreme Court's unequivocal holding that "the President is not an agency within the meaning of the [APA]," Franklin, 505 U.S. at 796, 112 S.Ct. at 2773, defendants argue that plaintiffs cannot invoke section 702's cause of action or waiver of sovereign immunity. Defendants claim that although 28 U.S.C. § 1581(i)(2) provides for jurisdiction over plaintiffs' claims, it does not provide a cause of action, nor does it contain an express waiver of sovereign immunity allowing a party to obtain relief against a federal official. Furthermore, defendants assert that 28 U.S.C. § 2631(i) neither creates a right of action nor waives the sovereign immunity of the United States, but merely permits a plaintiff to commence an action in this court under 28 U.S.C. § 1581(i), if it has been aggrieved by agency action within the meaning of the APA. Finally, defendants claim that the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, provide no basis for jurisdiction, Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950), much less a cause of action or waiver of sovereign immunity.[7]

 The court notes, however, that while Congress adopted 5 U.S.C. § 702 as part of the APA, the waiver of sovereign immunity in § 702 applies to any proceeding in which a party seeks declaratory or injunctive relief regarding any federal official's ultra vires conduct under color of legal authority. See, e.g., Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C.Cir.1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA

---

7. As 28 U.S.C. § 1581(i) provides jurisdiction, the court does not address 28 U.S.C. §§ 2201–02

and 28 U.S.C. § 2631(i) as alternative bases for jurisdiction.

or not."); *Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C.Cir.1984). Moreover,

> where [an executive] officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden.

*Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949). "So, there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Commerce,* 74 F.3d at 1329.

Non-statutory review of executive action was recognized in *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902). In *McAnnulty,* plaintiffs sought an injunction against a subordinate official carrying out an order of the Postmaster General. The Court, granting relief, stated that

> acts of all [a government department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief. . . . Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.

*Id.* at 108–09, 23 S.Ct. at 38–39.

■ This reasoning has been recognized repeatedly. In *Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), plaintiffs sought to enjoin the Secretary of Agriculture for allegedly exceeding his statutory authority. *Id.* at 289, 64 S.Ct. at 560. The relevant statute did not provide for judicial review for plaintiffs, but the Court observed that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id.* at 310, 64 S.Ct. at 571. In a case relying on *McAn-*

*nulty,* the Court stated that "[g]enerally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker,* 355 U.S. 579, 581–82, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958). Courts will "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681, 106 S.Ct. 2133, 2141, 90 L.Ed.2d 623 (1986).

■ While relief against the President himself is extraordinary, though arguably possible for the performance of a ministerial duty, *see Franklin,* 505 U.S. at 802, 112 S.Ct. at 2776, injunctive relief is generally available to preclude *ultra vires* conduct by subordinate executive officials. *See Soucie v. David,* 448 F.2d 1067, 1072 n12 (D.C.Cir. 1971) ("courts have power to compel subordinate executive officials to disobey illegal Presidential commands" (citing *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952))); *see also Swan v. Clinton,* 100 F.3d 973, 977–81 (1996). Thus, the court may review Presidential action to determine if it complies with a statute and the court may order the USTR, as the President's trade agreement negotiating agent, and the Commissioner of Customs to comply with statutory limitations. Plaintiffs need not assert a further cause of action or waiver of sovereign immunity. *See Florsheim Shoe Co. v. United States,* 744 F.2d 787, 795 (Fed.Cir.1984) (holding President's action is reviewable only "to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements.").[8]

Defendants' assertions that *Franklin* and *Dalton* limit this review are unpersuasive. In *Franklin,* the Court stated that although

---

8. Even if the court were concerned that some of the language of *Franklin* and *Dalton* may indicate a move in a direction different from that taken in *United States Cane Sugar Refiners' Asso-* *ciation* and *Florsheim,* the holdings of the case are compatible. Accordingly, the Federal Circuit precedent remains binding and cannot be ignored.

the President's actions are not reviewable for abuse of discretion under the APA, they may still be reviewed for constitutionality. 505 U.S. at 801, 112 S.Ct. at 2775–76 (citing *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)). The Court went on to state that "[w]hile injunctive relief against executive officials like the Secretary of Commerce is within the court['s] power, *see Youngstown Sheet & Tube Co.,* [343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153] the District Court's grant of injunctive relief against the President himself is extraordinary." *Id.* at 802, 112 S.Ct. at 2776. Furthermore, in *Dalton,* the Court stated that

> We may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA. *See Dames & Moore v. Regan,* 453 U.S. 654, 667, 101 S.Ct. 2972, 2980, 69 L.Ed.2d 918 ... (1981). But longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President.

511 U.S. at 474, 114 S.Ct. at 1726–27. As the court's review is limited to whether the statutory prerequisites of 19 U.S.C. § 3521(b) were met prior to the President's Proclamation implementing the Agreement, no discretionary decision of the President is at issue. Accordingly, the court finds that plaintiffs' claims are judicially reviewable.

### B. Standing

Defendants argue that plaintiffs lack standing because they have failed to identify a "legal wrong" within the meaning of 5 U.S.C. § 702. *See Pennsylvania R.R. Co. v. Dillon,* 335 F.2d 292, 294 (D.C.Cir.1964) ("legal wrong" for purposes of APA § 10(a) means "the invasion of a legally protected right"). Defendants claim that the only "legal wrong" alleged by plaintiffs is the President's modification of the duties on imports of capacitors and resistors. The Supreme Court, however, has stated that "[n]o one has a legal right to the maintenance of an existing rate or duty." *United States v. George S. Bush & Co. Inc.,* 310 U.S. 371, 379, 60 S.Ct. 944, 946, 84 L.Ed. 1259 (1940) (quoting *Nor-*

*wegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933)); *see also North Am. Foreign Trading Corp. v. United States,* 783 F.2d 1031, 1032 (Fed.Cir.1986) ("No vested right to a particular classification or rate of duty or preference is acquired at the time of importation.").

As plaintiffs do not have a constitutional or inherent right to the level of duties they prefer, defendants claim that plaintiffs must identify a statute affording them a specific legal right that the government has adversely affected through agency action, as required by 5 U.S.C. § 702. Defendants argue that plaintiffs have identified no such right. Defendants assert that Section 111(b) of the URAA does not create a zone of protection for plaintiffs as the statute does not indicate that Congress sought to confer legal rights on any class of domestic producers.

■■■ The Supreme Court has recognized that the standing doctrine has both constitutional and prudential aspects. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). The constitutional aspect of standing is grounded in Article III's requirement of a case or controversy. *Id.* at 750–51, 104 S.Ct. at 3324–25. The Federal Circuit has noted that

> To satisfy this aspect of the standing doctrine, the plaintiff must not only have experienced some concrete injury-in-fact, but "[t]he injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision."

*Sacilor, Acieries Et Laminoirs de Lorraine v. United States,* 815 F.2d 1488, 1491 (Fed. Cir.1987) (quoting *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324–25 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450 (1976))); *see also Raines v. Byrd,* —— U.S. ——, ——, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). In the present case, affidavits and testimony submitted by plaintiffs indicate sufficient injury-in-fact for standing purposes, as the reduction in tariffs on imported capacitors and resistors is likely to cause plaintiffs some loss of U.S. market

share or some lowering of prices to meet the lowered prices of its imported competition. A favorable decision to plaintiffs would permit relief from this injury as the reduction on the tariffs for capacitors and resistors would be enjoined.

 The prudential aspect of the standing doctrine is derived, in the administrative context, from the requirement of 5 U.S.C. § 702 that a plaintiff challenging agency action must be "adversely affected or aggrieved." 5 U.S.C. § 702; *Sacilor*, 815 F.2d at 1491.[9] This inquiry rests on whether " 'the interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987) (quoting *Association of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970)). In applying this "zone of interest" test, the Court stated that, "[t]he essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.' " *Id.* at 399 (quoting *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984))(alteration in original). The Court further stated that,

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding;[ ] in particular, there need be no indication of congres-

sional purpose to benefit the would-be plaintiff.

*Id.* at 399–400.

 In the light of the foregoing, plaintiffs appear to be able to satisfy the "zone of interest" test. Section 111 of the URAA was enacted to enable the President to complete negotiations on "zero-for-zero" tariff eliminations which had begun during the Uruguay Round. The statute sets out limitations on the President's tariff modification authority. 19 U.S.C. § 3521. If that authority is exceeded by a negotiated agreement encompassing products other than those Congress intended, domestic producers are logical plaintiffs to contest the President's alleged disregard for the law. In any case, plaintiffs are not marginally related to the interests sought to be protected by section 111's limitations, and, thus, plaintiffs need not identify another statute providing a cause of action. *See supra* IIA. Accordingly, the court finds that plaintiffs have standing to challenge the actions of the executive branch in regard to the Presidential Proclamation at issue.

### C. Failure to State a Claim

Defendants contend that plaintiffs have failed to state a claim upon which relief can be granted in Counts I and II of their complaint, which challenge the constitutionality of Congress' delegation of law-making power to the President. The court finds that the parties make no new arguments to change the court's view of this issue from that expressed in *Kemet Electronics Corp.*, Slip Op. 97–84, at 7–8, 969 F.Supp. 82, 85–86. As a matter of law, plaintiffs cannot succeed upon this claim. Accordingly, the court grants defendants' motion to dismiss with regard to Counts I and II.

 Defendants also argue that plaintiffs fail to state a claim upon which relief can be granted with regard to Counts III and IV, which claim that the President exceeded the scope of his statutory proclamation authority

---

9. The court does not read 28 U.S.C. § 2631(i) to limit standing to persons aggrieved by final discretionary action of agency officials. Section 702 of Title 5, referred to in 28 U.S.C. § 2631(i), has application beyond the APA. *See, supra*, dis-

cussion. Furthermore, the test of 28 U.S.C. § 2631(i) requires a certain injury or effect; it is unconcerned with whether or not the action is brought under the APA.

 

by reducing tariffs on capacitors and resistors, which are alleged not to be the subject of reciprocal duty elimination negotiations during the Uruguay Round. Counts III and IV raise factual issues that cannot be resolved on the pleadings. Accordingly, defendants' motion to dismiss with respect to Counts III and IV is denied.

Defendants further assert in Count V of the complaint that plaintiffs lack standing to challenge the President's authority to negotiate and proclaim tariff reductions for products not produced by plaintiffs. Plaintiffs argue that machine tools were mentioned merely as an example of the USTR's allegedly *ultra vires* conduct. As Count V, however, does not involve products which plaintiffs produce, the court grants defendants' motion to dismiss with regard to Count V. *See McKinney v. United States Dept. of Treasury,* 799 F.2d 1544, 1554 (Fed. Cir.1986) (dismissing complaint for lack of standing where plaintiffs have not alleged a cognizable injury).

Finally, defendants claim that plaintiffs fail to state a claim upon which relief may be granted with respect to Counts VI and VII of the complaint, which relate to whether the President, acting through the USTR, failed to obtain statutorily required advice. Defendants submit documents attempting to prove that the USTR did in fact obtain the statutorily required advice. Defendants, however, cannot rely on factual evidence to support a motion to dismiss for failure to state a claim.

On a motion to dismiss for failure to state a claim pursuant to USCIT Rule 12(b)(5), the court assumes "all well-pled factual allegations are true" and construes "all reasonable inferences in favor of the nonmovant" in resolving whether the complaint sets forth facts sufficient to support a claim. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). "To determine the sufficiency of a claim, consideration is limited to the facts stated on the face of the complaint, documents appended to the complaint, and documents incorporated in the complaint by reference." *Fabrene, Inc. v. United States,* 17 CIT 911, 913 (1993) (citing *Allen v. West-Point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)). Accordingly, despite defendants' evidence, the court finds that plaintiffs have alleged facts sufficient to state a claim. Defendants' motion to dismiss with respect to Counts VI and VII is denied.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied. Defendants' motion to dismiss is granted with respect to Counts I, II, and V of the complaint; it is denied as to Counts III, IV, VI, and VII.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

**IT IS HEREBY ORDERED:** that plaintiffs' preliminary injunction is denied, and defendants' motion to dismiss is denied in part and granted in part.